Filed 12/7/21  P. v. Lo CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CAMDEN LO,<br><br>        Defendant and Appellant. | A159307<br><br>(Solano County<br>Super. Ct. No. FCR328007) |

Camden Lo (appellant) appeals his conviction, following a jury trial, of the first degree murder of his estranged wife.  (Pen. Code, § 187.)[1]  We conclude the finding of premeditation and deliberation lacks substantial evidence, and accordingly reduce the murder to second degree.  We reject appellant's other contentions.

---

[1] All undesignated section references are to the Penal Code.

BACKGROUND

Stanley Lo, the son of appellant and the victim Wen Ying Lo, was 20 years old when he testified at trial.[2] When Stanley was growing up, his parents owned a restaurant. Appellant worked long hours at the restaurant; Wen Ying worked there part time and also cared for the children. Appellant and Wen Ying argued a few times a month, with some of the arguments lasting several days. Stanley's understanding was that his mother was angry with his father for gambling and buying things, and his father was angry that his mother would not let him spend money the way he wanted.

During these arguments, Wen Ying loudly shouted at appellant and sometimes threw things at him, including a television remote and cups. Appellant typically did not shout at Wen Ying, and Stanley never saw him throw anything at her; instead, appellant's response was to retreat. When Stanley was in middle school, Wen Ying got angry with Stanley and swung a sword at him, striking him on the arm. On another occasion, she threatened a neighbor with a meat cleaver when the neighbor complained about the noise from her chopping meat.

In 2015, appellant and Wen Ying separated. Appellant stayed in the family home, while Wen Ying and the children moved in with her sister in southern California. Appellant filed for divorce the same year. After the separation, they continued to argue over the phone. Appellant told Stanley he was having trouble running the restaurant by himself and Wen Ying was taking money from the business. In 2016, Wen Ying became angry with Stanley, broke in his locked bedroom door, and hit him on the head multiple

---

[2] For convenience, we refer to Stanley Lo and Wen Ying Lo by their first names. No disrespect is intended. Appellant and Wen Ying also had an adult daughter; she did not testify.

2

times. Because of this incident, Stanley moved back in with appellant. Appellant again told Stanley he was having a hard time running the restaurant by himself, and Wen Ying was taking money from the restaurant. Stanley heard appellant angrily shouting at Wen Ying on the phone.

On February 9, 2017, the night before appellant and Wen Ying had a settlement conference in their divorce proceeding, Wen Ying called 911.[3] She was outside the family home, where appellant and Stanley were living; she told the dispatcher appellant had changed the locks and was not home, and she had a right to stay at the house that night. A few hours later, Wen Ying returned when Stanley and appellant were home. She called Stanley, angry and yelling that she wanted to get her belongings from the house. Appellant told Stanley he did not want to let Wen Ying in because he was afraid of her. Stanley gave his phone to appellant and heard his parents arguing on the phone. After they got off the phone, Wen Ying remained in front of the house yelling for about 30 minutes.

Appellant and Wen Ying attended the settlement conference the next morning. Wen Ying's divorce lawyer testified that, prior to the settlement conference, the parties had filed a joint settlement conference statement identifying disputed issues including whether Wen Ying owed appellant reimbursement for half of the tax penalties paid by the restaurant, whether a foreign property titled in Wen Ying's name was community property, and whether Wen Ying owed the community more than $375,000 she claimed had been used to repay loans from her sister. Wen Ying's attorney testified appellant seemed calm and not angry at the settlement conference. After the settlement conference, the parties and their attorneys discussed Wen Ying

---

[3] A recording of the call was played for the jury and a transcript was provided.

3

getting her personal property from the house. Wen Ying wanted her attorney to accompany her but her attorney refused; instead the parties agreed that Wen Ying would go to the house at 4:00 p.m. that day and only Stanley would be at the house.

Later that day, Stanley went to the restaurant after school. He arrived around 3:30 p.m. and ate. Appellant seemed sad and on the verge of tears, and said something about "losing in court." A little after 4:00 p.m., Wen Ying called Stanley, angry and asking why he and appellant were not at the house to let her in. Stanley told appellant, who reluctantly left for the house five or ten minutes later. Stanley had not been told about the agreement discussed at court that morning. Stanley did not leave with appellant because he was still eating, but left about 10 or 20 minutes later. It took about 30 minutes to drive from the restaurant to the house.

Around 5:00 p.m., a neighbor who lived across the street and a few houses down heard a woman screaming. At trial, she testified the scream lasted five to ten minutes, came from across the street in the direction of appellant's house, and sounded like "Help me!" or "Elp!" On the night of the incident, she told a responding officer the scream was less than a minute long, she could not tell which direction it came from, and she did not recall hearing any words.

When Stanley arrived at the house, his mother's car was there but his father's was not. Appellant pulled in seconds later, started crying hysterically, and told Stanley he had killed Wen Ying. He told Stanley not to go into the garage. Stanley went into the garage and saw his mother on the floor with a knife on top of her body. He had never seen the knife before, either in the house or at the restaurant. Appellant retrieved keys, cash, and a box containing three watches, and told Stanley to keep them. They drove

4

back to the restaurant in appellant's car. On the way, appellant seemed calm and made a few phone calls, including one to a relative in law enforcement, who in turn reported the crime. The police soon arrived at the restaurant.

An autopsy of Wen Ying revealed a fatal stab wound to her left chest, two nonfatal stab wounds to her upper abdomen, a nonfatal stab wound to her left leg, and a cut on one finger. Appellant had cuts and bruises on his hands that could have been defensive or offensive wounds, and an abrasion on his left chest indicative of blunt force trauma. Wen Ying had appellant's DNA under her fingernails and on the skin of her right hand. Wen Ying's blood was on the blade of the knife and her DNA was on the knife's handle. Appellant's DNA was not identified anywhere on the knife.

The jury convicted appellant of first degree murder and found true an allegation that he personally used a deadly weapon, a knife, during the murder. (§§ 187, subd. (a), 12022, subd. (b)(1).) The trial court sentenced appellant to a prison term of 25 years to life.

DISCUSSION

I.    *Premeditation and Deliberation*

Appellant argues insufficient evidence supports the jury verdict finding of premeditation and deliberation.[4] We agree.

A.    *Legal Background*

"In evaluating a claim that a conviction lacks sufficient evidence, ' "we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the

_____

[4] This was the only theory of first degree murder presented to the jury.

5

prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." ' " (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1019 (*Wear*).)

Murder is the unlawful killing of a person with malice aforethought. (§ 187, subd. (a).) First degree murder is murder committed by certain enumerated means including, as relevant here, a "willful, deliberate, and premeditated killing." (§ 189, subd. (a).) " 'The very definition of "premeditation" encompasses the idea that a defendant thought about or considered the act beforehand.' [Citation.] 'Deliberate' means ' " ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." [Citation.]' [Citation.]" ' [Citation.] Thus, ' "[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1264 (*Boatman*).) However, " ' " "[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' " ' " (*Id.* at p. 1265.) There is a " 'presumption that an unjustified killing of a human being constitutes murder of the second, rather than of the first, degree,' " and therefore " '[a reviewing court] must determine in any case of circumstantial evidence whether the proof is such as will furnish a *reasonable foundation* for an inference of premeditation and deliberation [citation] or whether it "leaves only to *conjecture and surmise* the conclusion that defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation." ' " (*Ibid.*)

6

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the Supreme Court " 'developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation.' [Citation.] *Anderson* observed that the evidence typically found sufficient to support such findings ' "falls into three basic categories: (1) facts about how and what [the] defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." ' [Citation.] [¶] *Anderson* observed that ' "[a]nalysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing]." ' " (*Wear, supra,* 44 Cal.App.5th at pp. 1023–1024.) However, the Supreme Court has noted "that *Anderson's* 'guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts

need not accord them any particular weight.'" (*Id.* at p. 1024, quoting *People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

B.    *Analysis*

Appellant argues this case is similar to *Wear.* In *Wear*, the defendant took a friend to meet the victim, "apparently intend[ing] to buy or steal a gun from [the victim] and possibly to supply him with heroin. The evidence suggested that an argument arose during the meeting, and [the victim], who had two guns with him, shot [the friend] once with one of them. [The defendant], who was unarmed, then seized that gun, shot [the victim] twice with it, and fled with the other gun." (*Wear, supra,* 44 Cal.App.5th at pp. 1009–1010.) The defendant was convicted of first degree murder. (*Id.* at p. 1010.) The Court of Appeal held there was insufficient evidence of premeditation and deliberation. (*Id.* at pp. 1023–1032.) Circumstances supporting a finding that the defendant "planned to obtain a gun from [the victim], do not, in and of themselves, support a reasonable inference that [the defendant] planned to *kill* [the victim]." (*Id.* at p. 1025.) The defendant "had threatened to kill [the victim] months before the shootings," but the threat was both remote in time and "evinced no particular plan to follow through." (*Id.* at pp. 1028–1029.) There was "some evidence of motive," specifically, the defendant and the victim "knew each other and had some sort of falling out that may have been unresolved at the time of the shootings." (*Id.* at p. 1029.) The fact that the defendant shot the victim "twice in the face from close range, at least once after [the victim] was already lying on the ground" was evidence that the defendant "*intentionally* killed [the victim]" but not evidence of premeditation. (*Id.* at pp. 1029–1031.) Evidence that, after the shooting, the defendant fled with the victim's possessions and attempted to avoid arrest "may tend to show guilt" but did not "support the conclusion that

8

[the defendant] committed premeditated and deliberate murder as opposed to second degree murder or any lesser homicide offense." (*Id.* at p. 1031.) "In sum, the lack of evidence of planning, weak evidence of motive, and absence of any other evidence suggesting premeditation and deliberation, combined with the strong evidence that [the defendant] impulsively shot [the victim] after [the victim] shot [the friend], leads us to conclude that insufficient evidence supports a verdict of premeditated murder." (*Id.* at p. 1032.)

The People, on the other hand, argue this case is akin to *People v. Perez* (1992) 2 Cal.4th 1117 (*Perez*). In *Perez*, the victim was found dead in her home with 38 knife wounds from two different knives. (*Id.* at pp. 1121–1122.) There was a serrated steak knife blade under her head and a broken knife handle near her feet; the knife handle appeared to be the same as the handles of knives in the victim's kitchen, and blood was found in the kitchen knife drawer. (*Ibid.*) There were no signs of forced entry; it appeared the defendant, who had gone to high school with the victim and her husband, entered the house while the victim was warming up her car. (*Ibid.*) The Supreme Court found the evidence of premeditation and deliberation, while "not overwhelming, . . . is sufficient" (*id.* at p. 1127) to support the first degree murder conviction: "Evidence of planning activity is shown by the fact that defendant did not park his car in the victim's driveway, he surreptitiously entered the house, and he obtained a knife from the kitchen. [Citations.] As to motive, regardless of what inspired the initial entry and attack, it is reasonable to infer that defendant determined it was necessary to kill [the victim] to prevent her from identifying him. [Citations.] She was acquainted with him from high school and obviously would have been able to identify him. The manner of killing is also indicative of premeditation and deliberation. The evidence of blood in the kitchen knife drawer supports an

9

inference that defendant went to the kitchen in search of another knife after the steak knife broke. This action bears similarity to reloading a gun or using another gun when the first one has run out of ammunition." (*Id.* at pp. 1126–1127.)

We find this case much closer to *Wear* than to *Perez.* First, there is no evidence of planning. The People argue "planning is shown by the fact that appellant picked up or brought a knife that was neither from his home nor from his restaurant." But this is pure speculation. " ' "A reasonable inference ' "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work." ' [Citation.] It must logically flow from other facts established in the action." ' " (*Boatman, supra,* 221 Cal.App.4th at p. 1266.) In contrast, in *Perez,* the inference that the defendant retrieved the knife used to stab the victim from the kitchen was not speculative because "it matched the kitchen knives and the victim's husband testified that he and [the victim] were well-organized and kept everything in its place." (*Perez, supra,* 2 Cal.4th at p. 1127.)

Nor is there evidence that appellant "created the opportunity to be . . . alone with his estranged wife," as the People argue: appellant could have done so much more easily by simply appearing at the house at 4:00 p.m. Instead, he was at the restaurant and only went to the house reluctantly when Wen Ying called Stanley demanding (as Stanley understood it) that they *both* come. Appellant knew Stanley was aware he was going to meet Wen Ying at the house, and apparently knew Stanley would be following him shortly. (See *Boatman, supra,* 221 Cal.App.4th at p. 1267 [no evidence of planning where the defendant did not kill the victim at "a remote or isolated location" but instead at a house "occupied by four other people who could identify him"].) When Stanley arrived, appellant immediately confessed and

10

was crying hysterically. "Defendant's behavior following the shooting is of someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan." (*Ibid.*)

Second, the manner of killing also does not evidence premeditation. To be sure, Wen Ying suffered four stab wounds, including one to her heart. "But '[i]t is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation. "If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations." ' " (*Wear, supra,* 44 Cal.App.5th at p. 1031.) Instead, many cases finding a brutal manner to be evidence of premeditation "emphasize[] the evidence that the murder was carried out in a deliberate manner against an unresisting victim—i.e., an 'execution-style' murder—and/or the lack of evidence suggesting that the murder was the product of ' "mere unconsidered or rash impulse hastily executed." ' " (*Id.* at p. 1030.) Here, in contrast, "the manner of killing [the victim] was not 'so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" . . . .' " (*Boatman, supra,* 221 Cal.App.4th at p. 1269.)

The People also argue the location of the garage for the killing is evidence of premeditation because "there would be no mess in the main part of the house where he still lived." Again, this is merely conjecture: there is no evidence that appellant lured Wen Ying into the garage or otherwise orchestrated the location of the killing. The People also argue appellant placed a sheet over Wen Ying's body and gathered valuables to give to Stanley for safekeeping, but we fail to see how these acts following the homicide demonstrate premeditation. (See *Wear, supra,* 44 Cal.App.5th at

11

p. 1031 ["[W]e do not see how these haphazard actions support the conclusion that Wear committed premeditated and deliberate murder as opposed to second degree murder or any lesser homicide offense."].) The People point to appellant's calm demeanor while driving with Stanley to the restaurant, but Stanley testified appellant was crying hysterically shortly after the killing.

Finally, there is evidence of some motive, but it is insufficient to support the verdict. Appellant and Wen Ying had fought about money for years, appellant was angry with her for taking money from the restaurant without helping him run it since their separation, and appellant hoped to recover some money through the divorce proceedings but thought they were not going well for him. (*People v. Rivera* (2019) 7 Cal.5th 306, 325 ["history of past contentious encounters" between the defendant and victim as well as the defendant's complaints about the victim "provided evidence of a prior relationship and conduct from which the jury could have inferred a motive to kill [the victim]"].) But there was no evidence appellant had ever threatened or physically harmed Wen Ying, or that he had reached a breaking point in their years-long conflict. "The second *Anderson* factor refers not merely to a motive to kill, but to the kind of motive that 'would in turn support an inference that the killing was the result of a "pre-existing reflection" and "careful thought and weighing of considerations" *rather than* "mere unconsidered or rash impulse hastily executed." ' " (*Boatman, supra,* 221 Cal.App.4th at p. 1268.) Moreover, *Anderson* indicated that generally evidence of motive alone was insufficient. (*Wear, supra,* 44 Cal.App.5th at p. 1024 ["*Anderson* observed that ' "[a]nalysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either

[planning] or [manner of killing]." ' "].)  Here, we have some evidence of motive, but no evidence that the planning or manner of killing demonstrated premeditation and deliberation.

"A first degree murder conviction premised upon premeditation and deliberation requires more than a showing of the intent to kill; it requires evidence from which reasonable jurors can infer that the killing is the result of the defendant's preexisting thought and reflection." (*Boatman, supra,* 221 Cal.App.4th at p. 1274.)  Such evidence is not present here.  Aside from his arguments on self-defense, which we reject in Part II, appellant does not dispute that there was sufficient evidence to support the murder verdict, and we will reduce the conviction to second degree murder.  (See *ibid.* ["[W]e conclude that there is ample evidence to support the jury's verdict of murder, but insufficient evidence to support the finding that defendant killed [the victim] with premeditation and deliberation.  We will therefore reduce the conviction to second degree murder."].)

II.    *Self-Defense / Imperfect Self-Defense*

Appellant argues the trial court erred by refusing his proposed instructions on self-defense and imperfect self-defense.  We find no error.

"The subjective elements of self-defense and imperfect self-defense are identical.  Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262 (*Viramontes*).) " '[F]or either perfect or imperfect self-defense, the fear must be of imminent harm.  "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of imminent danger to life or great bodily injury." ' " (*People v. Battle* (2011) 198 Cal.App.4th 50, 72 (*Battle*).)  "To require instruction on either

13

theory, there must be evidence from which the jury could find that appellant actually had such a belief." (*Viramontes*, at p. 1262.) The trial court is obligated to instruct "on lesser included offenses if there is substantial evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser. [Citation.] The obligation also applies, with reservations not applicable here, to instruction on defenses when they are supported by substantial evidence. [Citation.] [¶] In this context substantial evidence means evidence which is sufficient to deserve consideration by the jury and from which a jury composed of reasonable persons could conclude the particular facts underlying the instruction existed. The trial court is not required to present theories the jury could not reasonably find to exist." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78 (*Oropeza*).) "On appeal, we review independently the question whether the trial court failed to instruct on defenses and lesser included offenses." (*Ibid.*)

As appellant argues, evidence that a defendant believed in the need to defend against imminent peril "may be present even though appellant did not testify or make a statement admitted at trial." (*Viramontes, supra,* 93 Cal.App.4th at p. 1262.) In *Viramontes,* for example, the defendant did not testify or make a statement, but others testified they saw someone shoot at appellant before appellant fired. (*Id.* at p. 1263.) The Court of Appeal concluded, "If the jury believed these witnesses, it could find appellant had an actual belief that he was in imminent peril and that lethal force was necessary to defend himself against the person who shot at him." (*Ibid.*) In contrast, in *Oropeza*, the defendant "did not testify and made no out-of-court comments indicating that when he fired, he believed it necessary to defend his life or to avoid great bodily injury. It is the case that the 'substantial evidence of a defendant's state of mind may be found in the testimony of

witnesses other than a defendant.' [Citations.]  Here, however, no witness testified appellant fired out of fear or testified appellant appeared fearful.  No witness to the incident . . . stated they believed deadly force was necessary to protect them." (*Oropeza, supra,* 151 Cal.App.4th at p. 82.)

Appellant did not testify at trial and his only out-of-court statement about the killing, to Stanley, gave no indication that he killed Wen Ying out of fear or that she attacked him first.  In addition, as in *Oropeza* and unlike *Viramontes,* there was no other evidence that Wen Ying initiated an attack on appellant in the garage.  Appellant's claim that the presence of Wen Ying's DNA on the knife's handle could support a reasonable inference that she "held the knife as a weapon" is unavailing: there was plainly a struggle, as evidenced by appellant's injuries and the presence of his DNA under Wen Ying's fingernails, and it would be sheer speculation to find that her DNA on the knife's handle was from wielding it before appellant attacked her instead of from trying to wrest it from appellant during the struggle.  Appellant also points to evidence of Wen Ying's past conduct, including throwing items at appellant and striking Stanley, and evidence that the night before appellant killed her he said he was afraid of her.  While "prior assaults and threats[] may be considered in determining whether the accused perceived an imminent threat of death or great bodily injury," the requirement that the fear be of imminent harm means self-defense will not excuse or reduce a killing " 'unless more than merely threats and a history of past assaults is involved.' " (*Battle, supra,* 198 Cal.App.4th at pp. 72–73.)  Because there was no evidence from which the jury could find appellant actually believed in the need to defend himself, the trial court properly denied the instructions.

III.    *Clarifying Instruction*

Appellant argues the trial court erred in denying his request for a special instruction.  We reject the claim.

The jury was instructed on circumstantial evidence, as relevant here: "[B]efore you may rely on circumstantial evidence to find the defendant guilty, . . . you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence."  (See CALCRIM No. 224.)  Appellant requested the following instruction: "The instructions on circumstantial evidence use the word 'innocence' to mean evidence less than that required to establish guilt, not to mean the defendant must establish innocence or that the prosecution has any burden other than proof beyond a reasonable doubt."  The trial court refused the instruction.

Appellant acknowledges cases rejecting similar arguments.  In *People v. Crew* (2003) 31 Cal.4th 822, the Supreme Court rejected an argument that instructions referring to " 'guilt or innocence' . . . relieved the prosecution of its burden of proof by implying that the issue was one of guilt or *innocence* instead of whether there was or was not a reasonable doubt about defendant's guilt.  Challenges to the wording of jury instructions are resolved by determining whether there is a reasonable likelihood that the jury misapplied or misconstrued the instruction.  [Citation.]  Here, it is not reasonably likely that the jury would have misapplied or misconstrued the challenged instructions, one of which expressly reiterates that defendant's guilt must be established beyond a reasonable doubt.  [Citation.]  The instructions in question use the word 'innocence' to mean evidence less than

16

that required to establish guilt, not to mean the defendant must establish innocence or that the prosecution has any burden other than proof beyond a reasonable doubt." (*Id.* at pp. 847–848; see also *People v. Wade* (1995) 39 Cal.App.4th 1487, 1492 [" 'Innocence' in this jury instruction is used simply to connote a state of evidence opposing guilt. To say that evidence 'points to' innocence does not suggest that a defendant has to prove his innocence. The language is used simply as a status of not guilty, a kind of compass or direction signal indicating where the evidence points."].)

Appellant attempts to distinguish these cases on the ground that the circumstantial evidence in his case pointed not to innocence but to a lesser included offense. The distinction is unavailing. The jury was instructed both on the presumption of innocence and the People's burden of proof beyond a reasonable doubt (CALCRIM Nos. 103, 220), and on the People's burden to prove beyond a reasonable doubt that the killing was not a lesser crime (CALCRIM Nos. 520, 521, 570). It is not reasonably probable the jury misunderstood the circumstantial evidence instruction in the manner proposed by appellant.

IV.    *Admission of Wen Ying's 911 Call*

Appellant contends the trial court erred in admitting Wen Ying's 911 call the night before the killing. We need not decide whether the trial court erred because we conclude any error was harmless.[5]

Appellant argues the asserted error was prejudicial under the state law standard and also deprived him of due process. " 'Ordinarily, even erroneous admission of evidence does not offend due process unless it is so prejudicial as to render the proceeding fundamentally unfair.' " (*People v. Covarrubias*

_____

[5] Because of this conclusion, we need not address the People's claim that appellant forfeited the argument by failing to sufficiently object below.

17

(2011) 202 Cal.App.4th 1, 20.) " 'Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional [state law] test: The reviewing court must ask whether it is reasonably probable the verdict[s] would have been more favorable to the defendant absent the error.' " (*Id.* at p. 21, fn. omitted.)

The prejudice identified by appellant stems from Wen Ying's statement during the 911 call that appellant had changed the locks on the family home. Appellant argues this "was the only arguably hostile act by [appellant]" against Wen Ying and allowed the prosecutor to argue appellant "sadistically" and "gleefully" denied Wen Ying access to the family home. To the extent appellant's argument relates to use of the evidence to establish premeditation and deliberation, our conclusion that this finding lacked substantial evidence renders the argument moot. In any event, in light of the ample evidence of appellant's years-long anger and frustration with Wen Ying, any error in admitting the 911 call was not prejudicial and did not render the proceedings fundamentally unfair.[6]

## DISPOSITION

The judgment is modified to reduce the conviction for first degree murder to second degree murder. As so modified, the judgment is affirmed. The matter is remanded for resentencing in light of the modified judgment. Following resentencing, the trial court is directed to prepare an amended abstract of judgment and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

---

[6] We reject appellant's claim of cumulative prejudice. Appellant also contends, and the People agree, that the abstract of judgment failed to reflect a stricken enhancement. Because we are remanding for resentencing and the preparation of an amended abstract of judgment, the issue is moot.

_____

Simons, J.

WE CONCUR:

_____

Jackson, P. J.

_____

Burns, J.

A159307